## MACON CONCRETE ROLLER CO. v. BROOKS-CALLAWAY CO.

(District Court, N. D. Georgia.    March 2, 1921.)

No. 141.

1. Patents ⚖=328—1,273,022, claims 5 and 6, for light concrete pavement roller and process, held valid.

The Ashmore and Morgan patent No. 1,273,022, claims 5 and 6, for a device and process for finishing concrete pavements by rolling them with a roller of small dimensions and relatively great length and light weight, adapted to float on semifluid concrete, *held* not anticipated by the use of heavy rollers, which sought to attain the result by pressure, instead of by agitation, as in the patented process and to be valid.

⚖=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**2. Patents ☞328—1,302,275, claims 1–3, for rollers for finishing pavements between street car rails, held invalid.**
The Ashmore and Morgan patent, No. 1,302,275, claims 1–3, for a roller to finish pavement between the rails of a railroad track and grooving the same next the rails, *held* anticipated by previous roller construction, and invalid.

In Equity. Suit for infringement of patents by the Macon Concrete. Roller Company against the Brooks-Callaway Company. Decree rendered for complainant as to one patent, and for defendant as to the other.

Harris, Harris & Witman, of Macon, Ga., S. J. Cox, of New York City, and McDaniel & Black, of Atlanta, Ga., for plaintiff.

Wilkinson, Huxley, Byron & Knight, of Chicago, Ill., and Troutman & Freeman, of Atlanta, Ga., for defendant. ·

SIBLEY, District Judge. The infringement insisted upon is of claims 5 and 6 of patent No. 1,273,022, granted July 16, 1918, to Ashmore and Morgan, for a device and process for finishing concrete pavements by rolling same when fresh and plastic with a roller of small diameter and relatively great length and light weight, so as to be adapted to float on the semifluid concrete and smooth the same and eliminate excess water. Infringement is also alleged of claims 1, 2, and 3 of patent No. 1,302,275, granted the same persons on April 29, 1919, for a roller to finish pavement between the rails of a railroad track by a roller rolling upon the rails, and finishing the concrete surface, and grooving the same next to the rails. By the evidence and concessions made on the hearing, utility is not disputed, and the use of an infringing device is admitted, and the case turns upon the validity of the patents.

[1] A roller as an instrument and rolling as a method of smoothing and consolidating a soft surface are age-old. They were used upon concrete many years before the granting of the patents in question. First impressions are against the patentability; there seeming but a modification in degree of the old idea and instrument, such as mechanical skill in the art would suggest. Such was the first impression in the Patent Office. The former art in concrete, as other matters, depended for efficacy upon the weight of the roller. If there were inequalities in the surface, the roller, mounting them, imposed a larger part of its weight upon them, and compressed them until they were even with the general surface, which, with the ensuing more general distribution of the weight, would then support the roller. Repeated passage over the surface compressed and smoothed it. The greater the weight, the more efficient the roller. But a weighty roller could not be used upon a very soft surface, because it would simply mire into it, and, if the material rolled had surplus water in it, the rolling would only make the material more plastic and unrollable. So in the art of laying concrete pavement only the very stiff concrete was consolidated by rolling in this sense, and it was afterwards finished by an added unrolled coat of mortar.

A great economy in the work was then found in using a much more plastic concrete, and such is alone now used in pavement work; the finishing coat of mortar being also omitted. But this more economical form of concrete carried its disadvantages. The former heavy consolidating rollers were abandoned as unusable and ceased to have any place in the practical art. This concrete, like other, when first laid, was full of air-filled crevices, and unlike the dry concrete had much excess water also included. This, when absorbed or dried out, left the mixture porous and weakened physically, if not damaged chemically. Tamping as a means of solidifying and expelling the water and air was, like the heavy roller, not very effectual, because, while it would drive the solid portions of the mixture together and cause the air and water to rise from it, it did not remove the water, or smooth or straighten the surface of the concrete, and was expensive. It also would leave masses of the coarse aggregates nearer the surface at some points than others, with the result that they would protrude and drag, when the surface was leveled with a strike board, and their having less shrinkage than other parts of the mixture would make high places in the pavement when dried. Hand floats were used to smooth the surface and bring up the excess water in the surface coat; but this did not remove the water, but allowed it to a great extent to sink back, and the operation itself was difficult on a wide pavement, laborious, and expensive.

Nevertheless wet concrete had established itself as the material for pavements in the face of the difficulties stated. Now, concrete is but a mass of stones, the crevices between which are filled with sand, itself a mass of irregularly shaped solids, whose crevices in turn are filled and united by fine cement and water, making "mortar." If the larger solids are brought closer together, the intervening crevices are decreased, and the included sand, cement, water, and air are forced out. If, in turn, the grains of sand are themselves brought nearer together, the included cement and water and air will be forced from it, and, being lighter, will tend to rise to the surface. The nearer approach to each other of these solid masses may be compelled by pressure, as in the use of the heavy roller, or by a blow, as in the case of tamping, where conditions permit. If the solid masses were perfect spheres, like a peck of bullets, the only way to accomplish this would be by crushing or deforming them. But they are irregularly shaped, and as jumbled together indiscriminately may not be at all well packed. But as they partly float in a semifluid mixture, with the assistance of gravity alone, they may be made to pack themselves by agitation. Thus, if a bucket of mortar be set aside for some minutes, water will rise to the surface, and the sand becomes stiff and consolidated. If it be rolled in a wheelbarrow over a pavement for a less time, the amount of water raised and the consolidation of the sand will be much greater.

The conception that a roller, which in the late development of the concrete art had been abandoned because its weight made it unusable, might be used for every beneficial purpose, if, instead of its weight, its relative lightness were depended on, and consolidation attained more by the gravity of the rolled material than by that of the roller, in

my judgment was invention. The conception was new. The practical contractor to whom it was first presented very emphatically expressed his contempt of it. The Examiner of Patents, in his first letter of May 2, 1916, rejecting the claims, said:

"The action of the roller is believed to be inconsistent with the applicant's insistence upon the lightness of the roller."

Only by the exhibition of numerous testimonials to the actual performance of the method and device was approval secured. The fact is indisputably established that a very great and sudden improvement in the art has followed the use of this idea, an advance resulting, not only in economy of operation, but excellence of product. The insistence of the patent upon "a small diameter and a comparatively great length," securing thereby a long bearing surface with light weight, is vital to this, but a reversal of the old heavy roller, where short bearing surface and great weight were sought. So the detail of "comparatively light weight adapted to float on soft, plastic concrete" is expressive of the fundamental idea of this invention, but a reversal of all previous notions of rollers, by which a floating roller would be a foolish paradox and a contradiction in terms. Noting the action of this new "roller" when it passes first over the rough, but soft, mass, in riding upon the high places, it acts as an ordinary roller in pushing them down to a general level, the softness of the mass permitting this, in spite of the light weight of the roller. Additional weight may be given it, if occasionally necessary, by bearing on the handle. Its great length insures that the level established is the general level of the work.

This action on the soft concrete soon causes much air and water and mortar to rise, making a fluid coating over the work. This would disable a heavy roller, but enables this to do its work better, for its rolling weight is lessened by its getting partially afloat, and it touches but lightly the stony masses beneath, yet enough to press all to a common level below the surface. The mixture is kept by the roller's motion in a quaking state, whereby the solid particles of stone and sand are, by gravity, continually packing themselves closer together, allowing water and air to escape to the surface. The roller is not now a true roller, but an agitator. Thereupon the roller, by appropriate use, is made to push the accumulating water off the work; the agitation continuing. Soon, the water having been much decreased and the mortar above the stones becoming more solid, it will again sustain the weight of the instrument, which smooths and presses it as a true, though light, roller. Doubtless prolonged and careful use would produce an almost smooth surface, but in practice this is more readily and perhaps better done by running a belt or hose across the surface.

While the device is simple and inexpensive, and readily understood in its action, the original improbability of the results, the adaption of the roller to several functions at once, which no other device possessed, and the astonishing results secured, seem to me to establish invention. The expression "roller method," now used in the art, is unconscious testimony to its originality. Its specification by engineers is a tribute to its usefulness, and its ready and voluntary adoption by contractors approves its economy. The heavy rollers of the prior art

are not an anticipation, but an antithesis. The marking rollers mentioned in the evidence were for the real purpose of indenting the finished surface, and not of finishing it. If they were ever used to run off surplus water, the use was purely incidental and developed 'into nothing. None of the patents cited seem to involve the principle of this. Some uncertainty suggests itself as to how great a length compared to diameter, and how light a weight, would constitute infringement of the claims. The vital thing is that the roller is "adapted to float." It must be light as compared to the concrete mixture. The relation of diameter to length bears only on securing such lightness, combined with a useful leveling capacity.

I find no basis for the contention that the patentees were not joint inventors. I see no practical point in seeking to invalidate the claim for the method, on the ground that it consists only in using the device. If that be true, every act which would infringe one claim would also infringe the other.

[2] The roller of patent No. 1,302,275, in so far as it may be used as a "floating roller," is nothing but the former patent. It is, however, made much heavier, and evidently designed to be supported by the track rails rather than by the semiliquid concrete. So supported, it is anticipated by patent No. 910,073, to Lische, if not by the ordinary roller. As a marking or edging device, it is anticipated by patent No. 1,157,899,. to Peterson. To make a groove next the rails for the car wheels by what is in substance a pair of car wheels is not invention. This patent is held invalid. Claims 5 and 6 of patent No. 1,273,022 are held valid and infringed.